STATE OF NORTH CAROLINA v. CHARLES JAMES CONWAY

No. COA08-106

(Filed 2 December 2008)

**1. Drugs— manufacturing methamphetamine—sufficiency of evidence—production process**

The trial court did not err by denying defendant's motion to dismiss the charge of manufacturing methamphetamine even though defendant contends the State was required to show he participated in every step of the production process because: (1) N.C.G.S. § 90-87(15) provides that manufacturing includes the production, preparation, propagation, compounding, conversion, or processing of a controlled substance by any means; (2) where a statute contains two clauses which prescribe its applicability and the clauses are connected by a disjunctive, the application of the statute is not limited to cases falling within both clauses, but will apply to cases falling within either of them; and (3) the evidence viewed in the light most favorable to the State revealed defendant manufactured methamphetamine as defined by N.C.G.S. § 90-87(15) including evidence that defendant had conversation with his girlfriend about making methamphetamine, the girlfriend testified that defendant was involved in the process of methamphetamine production, and precursor chemicals and other products used in the production of methamphetamine were found after a search of the inside and outside of defendant's residence.

**2. Drugs— trafficking methamphetamine—sufficiency of evidence—"mixture" containing detectable but undetermined amount of methamphetamine**

The trial court erred by denying defendant's motion to dismiss the charges of trafficking in 400 grams or more of methamphetamine based on the State's failure to show more than a detectable amount of methamphetamine was found in 530 grams of a liquid mixture because: (1) the toxic liquid was a step in the process of manufacturing and could not be ingested, used, or consumed as methamphetamine; (2) the General Assembly's deliberate choice to include the coordinating and disjunctive clause "or any mixture containing such substance" in the definition of trafficking in methaqualone, cocaine, heroin, LSD, and MDA/MDMA and the exclusion or omission of this clause in the definition of

**STATE v. CONWAY**

[194 N.C. App. 73 (2008)]

trafficking in methamphetamine, together with the well-established rules of statutory construction, required the reversal of defendant's trafficking convictions; (3) the General Assembly did not intend for the total weight of a "mixture" containing a detectable, but undetermined, amount of methamphetamine to be used to establish and escalate the quantity necessary to charge defendant with trafficking; and (4) the State failed to show defendant possessed 28 grams or more of methamphetamine, which was the minimum amount to support a trafficking charge.

Appeal by defendant from judgment entered 17 May 2007 by Judge Kenneth F. Crow in Onslow County Superior Court. Heard in the Court of Appeals 30 October 2008.

*Attorney General Roy Cooper, by Special Deputy Attorney General Philip A. Telfer, for the State.*

*Glover & Petersen, P.A., by James R. Glover and Ann B. Petersen, for defendant-appellant.*

TYSON, Judge.

Charles James Conway ("defendant") appeals judgments entered after a jury found him to be guilty of: (1) three counts of possession of an immediate precursor with the intent to manufacture methamphetamine; (2) felonious maintaining and keeping a dwelling for a controlled substance; (3) manufacturing methamphetamine; (4) trafficking by possession of 400 grams or more of methamphetamine; and (5) trafficking by manufacture of 400 grams or more of methamphetamine. We find no error in part, reverse in part, and remand for resentencing.

## I. Background

On 1 April 2006, Probation Officer Clay Taylor ("Taylor") visited the residence of defendant and Christine Clark ("Clark") located at 327 Queen's Road, Hubert, North Carolina. Clark had previously been convicted of obtaining property by false pretenses and was placed on supervised probation. After repeated positive drug tests for methamphetamine, Clark was placed on electronic house arrest. Clark had violated the terms of her house arrest by leaving her residence without prior authorization earlier that day.

As Taylor approached the front door, he detected a "very strong chemical smell." Through the window, Taylor observed Clark as

she placed two Mason jars filled with a liquid substance behind a "makeshift bar" separating the kitchen and living room. Taylor entered the residence, detected an even stronger chemical smell, and his eyes began to burn and tear up.

Defendant was located in a bedroom on the right side of the residence with the door shut. Taylor exited the residence and called Onslow County Sheriff's Detective Robert Ides ("Detective Ides") of the narcotics unit to inform him that a possible "meth lab" was located within the residence. Taylor re-entered the residence to arrest Clark for her probation violation. Defendant informed Taylor that he was leaving and "fled the residence."

Once Detective Ides arrived at the residence, he and Taylor conducted a walk-through. Based on his observations, Detective Ides also suspected that a "meth lab" was present within the residence. Detective Ides called State Bureau of Investigation ("SBI") Agent Steven Zawistowski ("Agent Zawistowski") to evaluate the residence and determine whether it was necessary for the special response team to be brought to investigate and "clean up" the location. Agent Zawistowski arrived on the scene, determined that a "meth lab" was being operated at the residence. Detective Ides and Agent Zawistowski subsequently obtained and executed a search warrant for the residence.

The following day, the SBI's special response team arrived at the scene. Lisa Edwards ("Edwards"), a forensic chemist, documented the relevant items found within the residence and gathered samples for SBI lab analysis. Edwards retrieved samples from three glass jars containing a bi-layered liquid. Testing showed each glass jar contained a detectable amount of methamphetamine. The total weight of the liquids in the three jars equaled approximately 530 grams. The exact quantity of methamphetamine located within the liquid was not determined.

The State allowed Clark to plead guilty to one count of "Trafficking in Methamphetamine Level I" and imposed a sentence of a minimum of seventy months to a maximum of eighty-four months active imprisonment. In exchange for the plea bargain, Clark agreed to "provide truthful testimony" against defendant.

At defendant's trial, Clark testified that she and defendant had conversations about making methamphetamine. Clark also testified to defendant's involvement in the production of methamphetamine.

Clark admitted she was addicted to methamphetamine and found it difficult to remember events clearly. Clark testified that defendant purchased Actifed©, a product containing pseudoephedrine, and placed the pills in a 20-ounce soda bottle to "sit" for awhile. Defendant poured the dried contents out of the bottle into a glass bowl and "scrape[d] it out." This process was repeated over the course of an afternoon. Clark further testified that she and defendant had daily visitors at their residence, who would "assist in helping to make the methamphetamine."

Defendant did not testify on his own behalf, call other witnesses, or present any evidence to the trial court. The jury found defendant to be guilty of all charges. The trial court sentenced defendant to consecutive terms of a minimum of sixteen and a maximum of twenty months imprisonment for each of his three possession of an immediate precursor with the intent to manufacture methamphetamine convictions. The trial court consolidated defendant's manufacturing methamphetamine and maintaining a dwelling convictions into one judgment and imposed a consecutive sentence of a minimum of seventy-three months and a maximum of ninety-seven months imprisonment. The trial also consolidated both of defendant's trafficking in methamphetamine convictions and imposed a concurrent sentence of a minimum of 225 months and a maximum of 279 months imprisonment. Defendant appeals.

## II.  Issues

Defendant argues the trial court erred by: (1) denying his motion to dismiss the charges of manufacturing methamphetamine and trafficking in methamphetamine by manufacture and (2) denying his motion to dismiss the charges of trafficking in 400 grams or more of methamphetamine.

## III.  Motions to Dismiss

### A.  Standard of Review

The standard for ruling on a motion to dismiss is whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense. Substantial evidence is relevant evidence which a reasonable mind might accept as adequate to support a conclusion. In ruling on a motion to dismiss, the trial court must consider all of the evidence in the light most favorable to the State, and the State is entitled to all reasonable inferences which may be drawn from

the evidence. Any contradictions or discrepancies arising from the evidence are properly left for the jury to resolve and do not warrant dismissal.

*State v. Wood*, 174 N.C. App. 790, 795, 622 S.E.2d 120, 123 (2005) (internal citations and quotations omitted).

## B. Manufacturing Methamphetamine

**[1]** Defendant argues the trial court erred by denying defendant's motion to dismiss the charge of manufacturing methamphetamine. We disagree.

"Manufacture" is statutorily defined as:

> *the production, preparation, propagation, compounding, conversion, or processing of a controlled substance by any means*, whether directly or indirectly, artificially or naturally, or by extraction from substances of a natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis; and "manufacture" further includes any packaging or repackaging of the substance or labeling or relabeling of its container . . . .

N.C. Gen. Stat. § 90-87(15) (2007) (emphasis supplied). This Court has previously addressed this manufacturing statute in the context of a motion to dismiss a charge of possession with intent to manufacture, sell, and deliver methamphetamine. *State v. Alderson*, 173 N.C. App. 344, 348, 618 S.E.2d 844, 847 (2005). However, the facts and holding of *Alderson* are not particularly instructive because this Court's analysis focused on the circumstances sufficient to establish the intent to sell or deliver. *Id.* Here, our analysis is focused upon whether defendant's actions were sufficient to constitute manufacturing as defined in the statute.

Defendant argues that to be charged and convicted of manufacturing methamphetamine, the State must show he participated in every step of the production process. This contention is without merit. N.C. Gen. Stat. § 90-87(15) clearly states that manufacturing includes "the production, preparation, propagation, compounding, conversion, *or* processing of a controlled substance *by any means* . . . ." (Emphasis supplied). This Court has stated, "[w]here a statute contains two clauses which prescribe its applicability, and the clauses are connected by a disjunctive (e.g. 'or'), the application of the statute is not limited to cases falling within both clauses, but

will apply to cases falling within either of them." *Grassy Creek Neighborhood Alliance, Inc. v. City of Winston-Salem,* 142 N.C. App. 290, 296, 542 S.E.2d 296, 300 (2001) (citation and quotation omitted).

The State's evidence at trial tended to show that Clark and defendant had conversations about making methamphetamine. Clark also testified that defendant was involved in the process of methamphetamine production. Defendant purchased a product containing pseudoephedrine, placed the pills in a 20-ounce soda bottle, and conducted a "pill wash." Defendant then dried the contents of the bottle and "scrape[d] . . . out" the remnants. This process was repeated over the course of an afternoon. A search of the inside and outside of defendant's residence revealed the presence of precursor chemicals and other products used in the production of methamphetamine. We note defendant did not appeal his convictions for these separate, but related crimes.

Viewed in the light most favorable to the State, sufficient evidence was presented tending to show defendant manufactured methamphetamine as defined by N.C. Gen. Stat. § 90-87(15). *Wood,* 174 N.C. App. at 795, 622 S.E.2d at 123. The trial court properly denied defendant's motion to dismiss the charge of manufacturing methamphetamine. This assignment of error is overruled.

### C.  Trafficking in Methamphetamine

[2] Defendant argues the trial court erred by denying his motion to dismiss the charges of trafficking in 400 grams or more of methamphetamine when the State's evidence failed to show "more than a detectable amount of methamphetamine was found" in 530 grams of a liquid mixture. We agree.

The determinative question before us is whether the entire weight of a liquid containing a detectable, but undetermined, amount of methamphetamine establishes a violation of N.C. Gen. Stat. § 90-95(h)(3b). The North Carolina trafficking statute provides, in relevant part:

Any person who sells, manufactures, delivers, transports, or possesses 28 grams or more of methamphetamine or amphetamine shall be guilty of a felony which felony known as "trafficking in methamphetamine or amphetamine" and if the quantity of such substance or mixture involved:

. . . .

c. Is 400 grams or more, such person shall be punished as a Class C felon and shall be sentenced to a minimum term of 225 months and a maximum term of 279 months in the State's prison and shall be fined at least two hundred fifty thousand dollars ($250,000).

N.C. Gen. Stat. § 90-95(h)(3b)c (2007). The preceding statute is silent on whether the weight of a liquid mixture containing detectable, but undetermined, amounts of methamphetamine is sufficient to meet the requirements set forth within the statute to constitute "trafficking." This appears to be an issue of first impression in North Carolina and requires us to engage in statutory construction. *See State v. Jones*, 358 N.C. 473, 477, 598 S.E.2d 125, 128 (2004) ("[W]here a statute is ambiguous, judicial construction must be used to ascertain the legislative will." (Citation and quotation omitted)).

### i. Rules of Statutory Construction

The rules concerning statutory construction are well established: "[t]he cardinal principle of statutory construction is to discern the intent of the legislature. In discerning the intent of the General Assembly, statutes *in pari materia* should be construed together and harmonized whenever possible." *State v. Jones*, 359 N.C. 832, 835-36, 616 S.E.2d 496, 498 (2005) (internal citations omitted). "Portions of the same statute dealing with the same subject matter are to be considered and interpreted as a whole, and in such case it is the accepted principle of statutory construction that every part of the law shall be given effect if this can be done by any fair and reasonable intendment . . . ." *State v. Hollars*, 176 N.C. App. 571, 573, 626 S.E.2d 850, 852 (2006) (citation and quotation omitted).

"Words and phrases of a statute 'must be construed as a part of the composite whole and accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit.'" *Id.* at 574, 626 S.E.2d at 853 (quoting *Underwood v. Howland*, 274 N.C. 473, 479, 164 S.E.2d 2, 7 (1968)). When construing an ambiguous criminal statute, we must apply the rule of lenity, which requires us to strictly construe the statute in favor of the defendant. *State v. Hinton*, 361 N.C. 207, 211, 639 S.E.2d 437, 440 (2007) (citation and quotation omitted). "However, this [rule] does not require that words be given their narrowest or most strained possible meaning. A criminal statute is still construed utilizing 'common sense' and legislative intent." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) (citations omitted).

## ii. Legislative History

Article 5 of Chapter 90, the North Carolina Controlled Substances Act, was amended in 1979 to include N.C. Gen. Stat. § 90-95(h), which added penalties for "trafficking" in certain types of controlled substances. *State v. Tyndall*, 55 N.C. App. 57, 59, 284 S.E.2d 575, 576 (1981). The legislative history of N.C. Gen. Stat. § 90-95 shows section (h) was added "in response to a growing concern regarding the gravity of illegal drug activity in North Carolina and the need for effective laws to deter the corrupting influence of drug dealers and traffickers." *State v. Proctor*, 58 N.C. App. 631, 635, 294 S.E.2d 240, 243 (1982) (citation and quotation omitted).

Section (h) of N.C. Gen. Stat. § 90-95 contains seven subdivisions each of which define the required elements of trafficking in: (1) marijuana; (2) methaqualone; (3) cocaine; (4) methamphetamine; (5) opium or opiate; (6) Lysergic Acid Diethylamide ("LSD"); and (7) MDA/MDMA. *See* N.C. Gen. Stat. § 90-95(h)(1)-(4). Each subsection establishes the quantity of the controlled substance, which must be proven by the State, in conjunction with the escalating mandatory minimum and maximum terms of imprisonment to be imposed as the quantity of the controlled substance increases. N.C. Gen. Stat. § 90-95(h)(1)-(4).

When defining the quantity of the controlled substance that is sufficient to establish trafficking in methaqualone, cocaine, heroin, LSD, and MDA/MDMA, the General Assembly specifically employed the coordinating and disjunctive clause: "*or* any mixture containing such substance." *See* N.C. Gen. Stat. § 90-95(h)(2), (3), (4), (4a), and (4b) (emphasis supplied). This coordinating and disjunctive clause is conspicuously absent from the trafficking in methamphetamine statute. N.C. Gen. Stat. § 90-95(h)(3b).

## iii. Applicable Case Law

This Court has addressed whether the trafficking statute envisioned the use of the total weight of a "mixture" containing some amount of a controlled substance to establish the minimum quantity required to convict a defendant of trafficking. *See State v. McCracken*, 157 N.C. App. 524, 526-28, 579 S.E.2d 492, 494-95 (2003); *State v. Jones*, 85 N.C. App. 56, 68, 354 S.E.2d 251, 258 (1987); *Tyndall*, 55 N.C. App. at 60, 284 S.E.2d at 576-77.

In *Tyndall*, at issue was the construction of the trafficking in cocaine statute, N.C. Gen. Stat. § 90-95(h)(3)(a). 55 N.C. App. at 59,

284 S.E.2d at 576. The defendant asserted that "the provision [did] not prohibit the sale of a mixture unless that mixture contain[ed] 28 grams of cocaine." *Id.* This Court disagreed and stated that it appeared from the General Assembly's usage of the language, "if the quantity of such substances *or mixture* involved is 28 grams or more . . ., such person shall be punished by imprisonment[,]" the quantity of the mixture containing cocaine was.sufficient in itself to constitute a violation of N.C. Gen. Stat. § 90-95(h)(3)(a). *Id.* at 60, 284 S.E.2d at 577 (emphasis original). This Court also noted the purpose behind the trafficking statute and stated:

> Our legislature has determined that certain amounts of con-
> trolled substances and certain amounts of mixtures containing
> controlled substances indicate an intent to distribute on a large
> scale. Large scale distribution increases the number of people
> potentially harmed by the use of drugs. The penalties for sales
> of such amounts, therefore, are harsher than those under G.S.
> 90-95(a)(1).

*Id.* at 60-61, 284 S.E.2d at 577.

In *State v. Perry*, the defendant challenged the constitutionality of the trafficking in heroin statute and argued:

> that the scheme of punishment provided for in this statute is irra-
> tional and violative of the equal protection and due process
> clauses of the United States Constitution because the scheme
> would punish more severely the possession of a small amount of
> heroin when mixed with a large amount of legal materials than
> for a smaller amount of pure heroin.

316 N.C. 87, 101, 340 S.E.2d 450, 459 (1986). Our Supreme Court rejected the defendant's contention based upon the purpose of the statute and stated "the imposition of harsher penalties for the pos-session of a mixture of controlled substances with a larger mixture of lawful materials has a rational relation to a valid State objective, that is, the deterrence of large scale distribution of drugs." *Id.* at 101-02, 340 S.E.2d at 459 (citations omitted).

In *State v. Jones*, this Court addressed the construction of the trafficking in opiates or heroin statute, N.C. Gen. Stat. § 90-95(h)(4). 85 N.C. App. 56, 354 S.E.2d 251 (1987). Following the reasoning in *Tyndall*, this Court stated "[c]learly, the legislature's use of the word 'mixture' establishes that the total weight of the dosage units . . . is [a] sufficient basis to charge a suspect with trafficking." *Id.* at 68, 354

S.E.2d at 258. Additionally, this Court noted that this interpretation had been held to be constitutional under Article I § 19 of the North Carolina Constitution and the due process and equal protection clauses of the United States Constitution. *Id.*

These precedents clearly establish that if the General Assembly had chosen to define the quantity of methamphetamine needed to constitute trafficking as 28 grams or more and added, as it did in other subsections of the trafficking statute, the disjunctive clause "or any mixture containing such substance," the total weight of the liquid found with detectable amounts of methamphetamine would be sufficient to establish a violation of N.C. Gen. Stat. § 90-95(h)(3b)c. However, the General Assembly chose not to use or include that operative language in the trafficking in methamphetamine statute. *See* N.C. Gen. Stat. § 90-95(h)(3b) ("Any person who sells, manufactures, delivers, transports, or possesses 28 grams or more of methamphetamine or amphetamine shall be guilty of a felony which felony shall be known as 'trafficking in methamphetamine or amphetamine' . . . .").

### iv.  Statutory Analysis

The State argues the trafficking statute must be read *in pari materia* with N.C. Gen. Stat. § 90-90(3), which classifies methamphetamine as a Schedule II controlled substance and delineates what is included in that term. N.C. Gen. Stat. § 90-90(3) (2007) states:

> The following controlled substances are included in this schedule:
>
> . . . .
>
> (3) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system unless specifically exempted or listed in another schedule:
>
> . . . .
>
> c. Methamphetamine, including its salts, isomers, and salts of isomers.

The State argues that "[b]y definition . . . the controlled substance 'methamphetamine' includes any mixture that contains any quantity of the drug." We disagree.

In *State v. Proctor*, the defendant was charged with trafficking in cocaine pursuant to N.C. Gen. Stat. § 90-95(h)(3). 58 N.C. App. at 633,

294 S.E.2d at 242. The defendant filed a motion for a bill of particulars requesting the State specifically identify the controlled substance at issue. *Id.* The State complied and stated "the substance was 'cocaine which is a derivative of coca leaves.' " *Id.* The defendant subsequently filed a motion to dismiss on the grounds that "a derivative of coca leaves" was not included in the language of N.C. Gen. Stat. § 90-95(h)(3). *Id.*

This Court duly noted that N.C. Gen. Stat. § 90-95(h)(3) omitted certain language included in the definition of cocaine contained in N.C. Gen. Stat. § 90-90(a)4, part of the schedule for controlled substances. *Id.* at 634, 294 S.E.2d at 242. N.C. Gen. Stat. § 90-90(a)4 is now codified as N.C. Gen. Stat. § 90-90(1)d. N.C. Gen. Stat. § 90-90(a)4 included in its definition: "(1) coca leaves; (2) any salts, compound, derivative or preparation of coca leaves; and (3) any salts, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances . . . ." *Id.* At the time the defendant was charged, the trafficking in cocaine statute omitted the second group contained in N.C. Gen. Stat. § 90-90(a)4. *Id.* This omission created uncertainty regarding what was included in the trafficking in cocaine statute. *Id.* This Court held that "the full definition of cocaine in G.S. 90-90(a)4 may be read into the trafficking in cocaine provisions of G.S. 90-95(h)(3)" and further stated:

> [T]he purpose of G.S. 90-95(h)(3) would not be served—indeed, it would be thwarted—by a more restrictive definition of cocaine than that in G.S. 90-90(a)4. Under these circumstances, we believe that the purpose of the trafficking statute must be given effect even if the strict letter thereof must be disregarded in order to do so. The schedules of controlled substances set forth in G.S. 90-89 through 90-94 and all the subsections of G.S. 90-95 deal with the same subject matter, violations of the Controlled Substances Act. Statutes dealing with the same subject matter are to be construed *in pari materia.*

*Id.* at 635, 294 S.E.2d at 243 (citations omitted). However, this Court carefully limited its holding to "th[o]se circumstances" and articulated the reasoning behind its decision. *Id.* This Court stated, "[i]t is apparent to us that the omission of the second group listed in G.S. 90-90(a)4 from the language of G.S. 90-95(h)(3) was not a deliberate choice by the legislature since it results in an incomplete and confusing definition for the crime of trafficking in cocaine." *Id.* at 634, 294 S.E.2d at 242. N.C. Gen. Stat. § 90-95(h)(3) has since been

amended to include "any salt, isomer, salts of isomers, compound, derivative, or preparation of coca leaves."

The statutes before us are distinguishable from the statutes at issue in *Proctor*. In that case, N.C. Gen. Stat. §§ 90-90(a)4 and -90(h)(3) contained virtually the same language. The omission of the "second group" from the trafficking in cocaine statute appeared to be no more than a clerical error by the General Assembly. Here, although N.C. Gen. Stat. § 90-90(3) defines methamphetamine for purposes of the schedule for controlled substances, the General Assembly chose not to use and specifically excluded that particular language in the trafficking in methamphetamine statute. *See* N.C. Gen. Stat. §§ 90-90(3), -95(h)(3b). We find it significant that N.C. Gen. Stat. §§ 90-89(3) and (4) and -90(1) define methaqualone, cocaine, heroin, LSD, and MDA/MDMA as "any mixture" containing that substance, for purposes of the schedule for controlled substances, yet the General Assembly still chose to include the coordinating and disjunctive clause "or any mixture containing such substance" in the definition of trafficking for all of these particular drugs. Reading North Carolina's trafficking statute as a whole, and *in pari materia*, a notable difference exists between the portion of the statute defining the quantity required to establish trafficking in methaqualone, cocaine, heroin, LSD, and MDA/MDMA and the portion of the statute defining the quantity required to establish trafficking in methamphetamine.

The omission or exclusion of the coordinating and disjunctive clause "or any mixture containing such substance" in N.C. Gen. Stat. § 90-95(h)(3b) indicates the General Assembly did not envision the use of the total weight of a "mixture" containing a detectable, but undetermined, amount of methamphetamine to establish the quantity required to convict a defendant of "trafficking." *See Evans v. Diaz*, 333 N.C. 774, 779-80, 430 S.E.2d 244, 247 (1993) ("Under the doctrine of *expressio unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list." (Citation omitted)).

Here, the State confiscated 530 grams of liquid in three Mason jars, which contained "detectable" amounts of methamphetamine from defendant's residence. The exact amount of methamphetamine located within the liquid was never determined. This toxic liquid was a step in the process of manufacturing and could not be ingested, used, or consumed as methamphetamine.

STATE v. CONWAY

[194 N.C. App. 73 (2008)]

Because the State failed to show defendant possessed 28 grams or more of methamphetamine, as required by the trafficking statute, the trial court erred by denying defendant's motion to dismiss both of his trafficking in methamphetamine charges. *Wood*, 174 N.C. App. at 795, 622 S.E.2d at 123. The trial court's order denying defendant's motion to dismiss his two trafficking in methamphetamine charges was error and the judgment entered upon the jury's verdicts is reversed. This case is remanded to the trial court for resentencing in light of our holding.

## IV. Conclusion

Viewed in the light most favorable to the State, sufficient evidence was presented at trial tending to show defendant manufactured methamphetamine as defined by N.C. Gen. Stat. § 90-87(15). The trial court properly denied defendant's motion to dismiss the charge of manufacturing methamphetamine.

The General Assembly's deliberate choice to include the coordinating and disjunctive clause "or any mixture containing such substance" in the definition of trafficking in methaqualone, cocaine, heroin, LSD, and MDA/MDMA and the exclusion or omission of this clause in the definition of trafficking in methamphetamine, together with the well-established rules of statutory construction, requires the reversal of defendant's trafficking convictions. The General Assembly did not intend for the total weight of a "mixture" containing a detectable, but undetermined, amount of methamphetamine to be used to establish and escalate the quantity necessary to charge defendant with trafficking. Because the State failed to show defendant possessed 28 grams or more of methamphetamine, the trial court erred by denying defendant's motion to dismiss both of his trafficking charges. Defendant's trafficking convictions in judgment 06 CRS 052987 are reversed. Defendant's remaining convictions are left undisturbed. This case is remanded to the trial court for resentencing.

No error in part, Reversed in part, and Remanded.

Judges CALABRIA and STROUD concur.